```
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------X
GINO MALDONADO, JOAN GILL and
ELIZABETH YEAMPIERRE,

                    Plaintiffs,            MEMORANDUM
                                            and ORDER
        – against –
                                            05 CV 5158 (SLT)(VVP)
GEORGE PATAKI, NEW YORK CITY
BOARD OF ELECTIONS and THE STATE OF
NEW YORK,

                    Defendants.
-----------------------------------------------------------X
```

**TOWNES, United States District Judge**:

In this action, plaintiffs, all of whom are registered Democratic voters residing in Kings County, principally seek a judgment declaring that "Chapter 240 of the Laws of New York State of 2005 violates Section 2 of the Voting Rights Act of 1965, as amended, 42 U.S.C. § 1973, and 42 U.S.C. § 1983." Complaint at 11. Together with their complaint, plaintiffs filed the instant motion for a preliminary injunction to prevent defendants from certifying the results of a recent election for a Kings County Surrogate's Court position created by that legislation.

For the reasons set forth below, plaintiffs' motion is DENIED.

## THE FACTS

This case relates to the enactment of Chapter 240 of the N.Y. Laws of 2005 ("Chapter 240"), which principally created 21 new judgeships, including a new Kings County Surrogate's Court position which is at issue in this

litigation.  Chapter 240 created this new position by amending N.Y. Judiciary Law § 179, which had previously provided only for two Surrogate's Court judgeships in New York County, to read, "The surrogate's courts of New York County *and Kings County* shall *each* consist of two surrogates."  N.Y. Judiciary L. § 179 (emphasis added).  However, Chapter 240 did not amend a related provision – N.Y. Judiciary Law § 180 – which provides that, if a Surrogate's Court position in New York County becomes vacant within three months of a general election, the governor can fill the vacancy until the following year's election.  Accordingly, section 180 does not apply to vacancies in Kings County Surrogate's Court.

Although Chapter 240 allegedly passed the New York State Assembly and Senate on June 24, 2005, the legislation was not signed into law by defendant Pataki until July 19, 2005.  Declaration of Alexander D. Widell in support of Order to Show Cause for Preliminary Relief ("Widell Declaration"), Ex. D.  By its own terms, Chapter 240, which became effective on August 1, 2005, provided that the additional judges, including the new Surrogate's Court judge, "shall first be elected at the general election to be held in November 2005 and shall first take office January 1, 2006."  Since the effective date was 17 days after the July 14, 2005, deadline for circulating "designating petitions," Complaint at ¶ 20, no primary election was held for the new Kings County Surrogate.  Rather, by operation of N.Y. Election Law § 6-116, the Kings County Democratic Committee selected the party's candidate:  a Caucasian male named Frank R.

2

Seddio.[1] In the general election, Mr. Seddio was elected to a 14-year term as a Kings County Surrogate.

In the instant complaint, plaintiffs assert that if a primary election had been held, Brooklyn voters would have selected a minority candidate. This assertion appears to be based largely, if not entirely, on census data which indicates that in 2000, "63.5 % of the voting age population of Kings County is comprised of racial and language minorities." Complaint at ¶ 36; *see* Widell Declaration, Ex. K. Plaintiffs do not allege what percentage of the registered voters in Kings County are minorities, or provide any basis for their assumption that voting would be strictly along racial lines.

Plaintiffs' complaint principally alleges that the "newly acted [*sic*] legislation . . . discriminates against the minority voters of Kings County, in violation of . . . Section 2 of the Voting Rights Act of 1965," by "denying the minority voters of Kings County the same opportunity that other members of the electorate have to participate in the political process and to elect representatives

---

[1]N.Y. Election Law § 6-116 provides, in pertinent part:

> A party nomination of a candidate for election to fill a vacancy in an elective office required to be filled at the next general election, occurring after seven days before the last day for circulating designating petitions or after the holding of the meeting or convention to nominate or designate candidates for such, shall be made, after the day of the primary election, by . . . a majority vote of a quorum of the members of a county committee or committees last elected in the political subdivision in which such vacancy is to be filled, or by a majority of such other committee as the rules of the party may provide.

Since the newly created position was vacant as of July 7, 2005 – seven days before the last day for circulating designating petitions – the members of the Executive Committee of the County Committee of the Democratic Party in Kings County nominated the candidate.

of their choice . . . ." Complaint at ¶¶ 1, 5. However, the complaint does not specifically allege that the delay in enacting Chapter 240 and the failure to amend N.Y. Judiciary Law § 180 was motivated by an intent to disenfranchise minority voters. Rather, the complaint specifically notes the history of corruption in Surrogate's Court and the "possibilities for patronage inherent in the position," *id.* at ¶ 14, suggesting that there was a pecuniary motivation for allowing the "Democratic Party leadership to hand pick their own preferred candidate" for the potentially lucrative position. *Id.* Indeed, the complaint specifically notes that the Court of Appeals recently removed the longtime Kings County Surrogate for appointing a friend to a "lucrative" counsel position and approving excessive counsel's fees without proper documentation. *Id.* at ¶ 15. The complaint also notes that the chairman of the Kings County Democratic Party was subsequently convicted of "illegally taking funds" and forced to resign from his post. *Id.* at ¶ 25.

***The Preliminary Injunction Standard***

"[A] preliminary injunction is an extraordinary remedy that should not be granted as a routine matter." *JSG Trading Corp. v. Tray-Wrap, Inc.*, 917 F.2d 75, 80 (2d Cir. 1990); *Collagenex Pharmaceuticals, Inc. v. Ivax Corp.*, 372 F.Supp.2d 120, 123 (E.D.N.Y. 2005). In order to obtain a preliminary injunction in this Circuit, the moving party must typically show "that 1) absent injunctive relief, it will suffer irreparable harm, and 2) either a) that it is likely to succeed on the merits, or b) that there are sufficiently serious questions going to the merits to

make them a fair ground for litigation, and that the balance of hardships tips decidedly in favor of the moving party." *Otokoyama Co. Ltd. v. Wine of Japan Import, Inc.*, 175 F.3d 266, 270 (2d Cir. 1999). However, when a party seeks an injunction to stay governmental action taken in the public interest pursuant to a statutory scheme, the more rigorous showing of likelihood of success on the merits is required. *See Beal v. Stern*, 184 F.3d 117, 122 (2d Cir. 1999).

In this case, plaintiffs argue that the "New Legislation" deprives them of their right to vote in a primary election for the new Surrogate, and that irreparable harm is presumed when a fundamental right, such as the right to vote, is withheld. Plaintiffs' Memorandum of Law in Support of Motion for Preliminary Injunction ("Plaintiffs' Memorandum") at 9 (citing *Hoblock v. Albany County Bd. of Elections*, 422 F.3d 77, 97 (2d Cir. 2005); *Puerto Rican Legal Def. & Educ. Fund, Inc. v. New York*, 769 F.Supp. 74, 79 (E.D.N.Y. 1991)). Defendants do not contest plaintiffs' assertion of irreparable harm, but rather argue that plaintiffs are unlikely to succeed on the merits.

In order for plaintiffs to succeed on the merits in this case, plaintiffs must establish that defendants violated Section 2 of the Voting Rights Act. Although plaintiffs' complaint alleges a violation of both Section 2 and 42 U.S.C. § 1983, the latter statute does not create any substantive rights, but only provides a procedure for redress for the deprivation of rights established elsewhere. *Sykes v. James*, 13 F.3d 515, 519 (2d Cir. 1993), *cert. denied*, 512 U.S. 1240 (1994). In order to prove a violation of § 1983, plaintiffs must prove, *inter alia*, that "the conduct

complained of . . . deprived a person of rights, privileges, or immunities secured by the Constitution or laws of the United States." *Pitchell v. Callan*, 13 F.3d 545, 547 (2d Cir. 1994). In alleging that defendants deprived them of the right to vote in a primary, plaintiffs are not alleging a violation of the United States Constitution, which does not, *per se*, protect the right to vote in primary elections. *See San Antonio Independent School Dist. v. Rodriguez*, 411 U.S. 1, 35 n.78 (1973). Plaintiffs' complaint does not specifically allege any other constitutional violations. Therefore, to establish a violation of § 1983 in this case, plaintiffs must establish a violation of Section 2 – the only federal statute which plaintiffs allege has been violated.

*Section 2*

Section 2 of the Voting Rights Act of 1965, which is codified, as amended, in 42 U.S.C. § 1973, "prohibits any state limitation on the right to vote that has a racially discriminatory result." *Muntaqim v. Coombe*, 366 F.3d 102, 107 (2d Cir. 2004). Subsection (a) of the statute provides:

> No voting qualification or prerequisite to voting or standard, practice, or procedure shall be imposed or applied by any State or political subdivision in a manner which results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color, or in contravention of the guarantees set forth in section 1973b(f)(2) of this title, as provided in subsection (b) of this section.

42 U.S.C. § 1973(a). Subsection (b) provides, in pertinent part, that:

> A violation of subsection (a) of this section is established if, based on the totality of circumstances, it is shown that the political processes leading to

6

> nomination or election in the State or political subdivision are not equally open to participation by members of a class of citizens protected by subsection (a) of this section in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice.

42 U.S.C. § 1973(b).

As the Second Circuit has observed, it "is exceedingly difficult to discern what [§ 1973] means." *Muntaqim*, 366 F.3d at 116; *see Goosby v. Town Bd. of Town of Hempstead, N.Y.*, 180 F.3d 476, 499 (2d Cir. 1999) (Leval, J., concurring), *cert. denied*, 528 U.S. 1138 (2000). Nonetheless, the Supreme Court, in examining the history of the statute and its 1982 amendment, has made clear that plaintiffs are not required to prove that the contested electoral practice was adopted or maintained with the intent to discriminate against minority voters. *See Thornburg v. Gingles*, 478 U.S. 30, 43-44 (1986). It is also "apparent that § 1973 does not prohibit *all* voting restrictions that have a racially disproportional effect." *Muntaqim*, 366 F.3d at 116 (emphasis in original). Rather, "[t]he essence of a § 2 claim is that a certain electoral law, practice, or structure interacts with social and historical conditions to cause an inequality in the opportunities enjoyed by black and white voters to elect their preferred representatives." *Gingles*, 478 U.S. at 47. Therefore, the "right" question in Section 2 cases is "whether as a result of the challenged practice or structure plaintiffs do not have an equal opportunity to participate in the political processes and to elect candidates of their choice." *Id.* at 44 (internal quotations and citations omitted).

7

In this case, plaintiffs have not adequately demonstrated that Chapter 240 deprived them of an equal opportunity to participate in the political process. Regardless of whether one considers plaintiffs as individuals or as representative of Brooklyn voters as a whole, the allegations in plaintiffs' complaint do not make out disparate treatment or discriminatory impact. First, plaintiffs were not treated differently than other individual voters in Kings County. All voters – minority and non-minority alike – were denied the opportunity to cast ballots in a primary election for the new Surrogate. Similarly, there is nothing to suggest that Kings County voters as a whole were treated differently than voters in other jurisdictions in which new judgeships were created by Chapter 240. To the contrary, defendants have provided evidence that candidates in predominantly white jurisdictions were similarly "hand-picked" by party leaders. *See* Memorandum of Law in Opposition to Motion for Preliminary Injunction ("Opposition Menorandum") at 20; Declaration of Joel Graber, Ex. N. Therefore, regardless of whether one focuses on individual voters or Kings County voters as a group, plaintiffs' allegations do not demonstrate discriminatory impact or disparate treatment.

Plaintiffs concede that Chapter 240's "August 1, 2005, effective date abolished the primary for all voters," Plaintiffs' Memorandum at 12, and that party nominations need not always result from primary elections. Plaintiffs' Reply Memorandum of Law at 3. However, plaintiffs assert that they had a

"statutory right to a primary election" and that defendants purposely delayed enacting Chapter 240 to deprive them of exercising their voting power. *Id.*

Plaintiffs do not adequately establish a factual and legal basis for this apparently novel theory.

*First*, plaintiffs' argument appears to be based on speculation that the Executive Committee of the Kings County Democratic Party (which plaintiffs conceded at oral argument is predominantly minority), the Republican Senate and the Republican governor conspired to prevent a minority Surrogate from being elected in Kings County. Plaintiffs, perhaps recognizing that this conspiracy is essentially unprovable, especially in the absence of any legislative history and in light of the fact that the party-preferred candidate for the existing Surrogate's seat was African-American, seek to shift the burden to defendants to disprove it. However, in the absence of any evidence of discriminatory impact, that burden remains squarely on plaintiffs.

*Second*, plaintiffs have not cited to a single case upholding, or even discussing, their far-reaching interpretation of Section 2. None of the cases cited by plaintiffs are even remotely similar to this case. In that section of Plaintiffs' Memorandum which discusses discriminatory impact, Plaintiffs' Memorandum at 12-16, plaintiffs cite to only one case which found a Section 2 violation: *Coalition for Ed. in Dist. One v. Board of Elections of City of New York*, 370 F.Supp. 42 (S.D.N.Y.), *aff'd*, 495 F.2d 1090 (2d Cir. 1974). In that case, a district court declared a school board election invalid in light of evidence of numerous

9

practices which effectively disenfranchised minority voters. The district court found, for example, that several polls servicing predominantly minority voters had opened "substantially later than 6:00 A.M.," that voting materials did not arrive at all at some such polls, and that these delays did not take place at polling sites serving predominantly white voters. 370 F.Supp at 49-50. That sort of blatantly disparate treatment is simply not present in this case.

The remaining three cases cited in plaintiffs' discussion of discriminatory impact are all cases which did not find a Section 2 violation and which, in any event, involved voting practices very different from the practices at issue herein. *Ortiz v. Philadelphia Office of City Com'rs Voter Registration Div.*, 824 F.Supp. 514 (E.D. Pa 1993), *aff'd*, 28 F.3d 306 (3d Cir. 1994), involved a challenge to Pennsylvania's voter purge law, which struck from the rolls those voters who had not voted in two years. *Wesley v. Collins*, 605 F.Supp. 802 (M.D. Tenn. 1985), *aff'd*, 791 F.2d 1255 (6th Cir 1986), involved a challenge to a Tennessee law disenfranchising felons. *Southwest Voter Registration Educ. Project v. Shelley*, 344 F.3d 914, 918 (9th Cir. 2003) (per curiam), involved a challenge to the use of notoriously unreliable punch card voting technology in counties having large minority populations.[2]

---

[2] Ironically, plaintiffs repeatedly cited to *Southwest Voter* at oral argument as supporting their application for injunctive relief. *Southwest Voter* is not only distinguishable from this case in that it clearly involved disparate treatment between districts, but is a case in which preliminary injunction relief was ultimately denied. The Ninth Circuit, finding that there was a "significant dispute in the record ... as to the degree and significance of the disparity," ruled that plaintiffs had only shown a possibility of success on the merits, not a "strong likelihood." *Southwest Voter*, 344 F.3d at 918-19.

Defendants, on the other hand, have identified a case which is somewhat similar to the case at bar. In *Shapiro v. Berger*, 328 F.Supp.2d 496 (S.D.N.Y. 2004), a putative candidate for a vacant town justice position brought an action pursuant to 42 U.S.C. § 1983, seeking an injunction forcing the town to hold a primary election. Although this action was brought pursuant to 42 U.S.C. § 1983, not Section 2, plaintiff argued, *inter alia*, that N.Y. Election Law § 6-116 was "discriminatory." The Court rejected that argument, stating:

> Plaintiffs' claim that holding a convention rather than a primary for Town Justice is somehow discriminatory is simply incorrect. Every voting system in this country "inevitably affects – at least to some degree – the individuals' right to vote and his right to associate with others for political ends." *Anderson v. Celebrezze,* 460 U.S. 780, 788 . . . (1983). "When a state election law provision imposes only 'reasonable, nondiscriminatory restrictions' upon the First and Fourteenth Amendment rights of voters, 'the State's important regulatory interests are generally sufficient to justify' the restrictions." *Id.* at 434 . . . (quoting *Anderson,* 460 U.S. at 788 . . .); *see also Burdick v. Takushi*, 504 U.S. 428, 439 . . . (1992) (describing the burden as "slight"). The purpose of N.Y. Elec. Law § 6-116 is to encourage the democratic selection of officeholders in general elections, and to prevent appointees from serving any longer than necessary. It does this by permitting vacancies to be filled at the next general election, even when they are created so close to the general election that holding a primary for the vacancy would be impractical. *See generally Dorfman v. Berman,* 186 Misc.2d 415, 718 N.Y.S.2d 142, 143-144 (2000). Plaintiffs have not shown that § 6-116 is either discriminatory on its face or as applied to them.

*Shapiro*, 328 F.Supp.2d at 503.

11

Although plaintiffs insist that they are not challenging "the validity of the alternative nomination scheme provided by N.Y. Elec. Law § 6-116, " Plaintiffs' Reply Memorandum at 3, § 6-116 is central to the wrongdoing plaintiffs perceive. After all, Chapter 240 does little more than establish new judgeships. It is Election Law § 6-116 which provides the mechanism by which defendants were able to avoid holding a primary for the newly created judgeships. Plaintiffs are troubled by the legislature's failure to amend N.Y. Judiciary Law § 180 only because this failure left § 6-116 applicable to the Surrogate's election. Therefore, although *Shapiro* was brought pursuant to § 1983, not § 1973, the *Shapiro* Court's finding that § 6-116 was not "discriminatory," militates against finding that the use of § 6-116 discriminated against plaintiffs in this case.

## CONCLUSION

For the reasons stated above, this Court concludes that plaintiffs have not shown a likelihood of success on the merits.[3] Plaintiffs' motion for a preliminary injunction is, therefore, DENIED.

SO ORDERED.

Dated: Brooklyn, New York
December 16, 2005

                                                                     S/
                                          SANDRA L. TOWNES
                                          United States District Judge

---

[3]Even if the "balance of hardships" standard were applicable to this case, this Court would not grant preliminary injunctive relief. "[A] federal court cannot lightly interfere with or enjoin a state election," *Southwest Voter*, 344 F.3d at 918, and this Court is not persuaded by the argument that to enjoin the certification of this election would do no more than preserve the status quo. Rather, it would frustrate the will of the legislature, as expressed in Chapter 240, and the will of the voters who cast ballots in the general election.